**Michael F. ARMSTRONG, et al., Plaintiffs-Appellees,**

v.

**Clovis McALPIN, et al., Defendants-Appellants.**

**No. 745, Docket 79-7042.**

United States Court of Appeals, Second Circuit.

Submitted to the En Banc Court Feb. 22, 1980.

Decided June 20, 1980.

Mulligan, Circuit Judge, concurred in part and dissented in part and filed opinion.

Meskill, Circuit Judge, concurred in part and dissented in part and issued statement.

Van Graafeiland, Circuit Judge, concurred in part and dissented in part and filed opinion.

Newman, Circuit Judge, concurred in part and dissented in part and filed opinion.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City (Franklin B. Velie, Paul D. Wexler, Bruce Siegel, New York City, of counsel), for plaintiffs-appellees.

Barrett Smith Schapiro Simon & Armstrong, New York City (Michael F. Armstrong, Martin F. Richman, Eric T. Singer, New York City, Susan L. Gotbetter [not yet admitted], of counsel), for receiver Michael F. Armstrong.

Lunney & Crocco, New York City (J. Robert Lunney, Michael J. McAllister, James J. DeLuca, New York City, of counsel), for defendants-appellants.

Alice Daniel, Asst. Atty. Gen., Washington, D. C. (Robert E. Kopp, Frederick D. Cohen, Attys., Civ. Div., Dept. of Justice, Washington, D. C., of counsel), for the United States as amicus curiae.

Ralph C. Ferrara, Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Paul Gonson, Sol., John P. Sweeney, Asst. Gen. Counsel, Anne C. Flannery, Sp. Counsel, Washington, D. C., Harlan W. Penn, Atty., of counsel), for the Securities and Exchange Commission as amicus curiae.

Robert S. Burk, Acting Gen. Counsel, I. C. C., Washington, D. C. (Frederick W. Read, III, Associate Gen. Counsel, Washington, D. C., of counsel), for the Interstate Commerce Commission as amicus curiae.

Brien E. Kehoe, Gen. Counsel, Federal Maritime Commission, Washington, D. C. (Edward G. Gruis, Deputy Gen. Counsel, John C. Cunningham, Atty., Washington, D. C., of counsel), for the Federal Maritime Commission as amicus curiae.

John G. Gaine, Gen. Counsel, Commodity Futures Trading Commission, Washington, D. C., for the Commodity Futures Trading Commission as amicus curiae.

Erwin N. Griswold, Washington, D. C. (Donald I. Baker, Griffin B. Bell, Robert H. Bork, Calvin J. Collier, Jr., Ronald J. Dolan, Michael J. Egan, Washington, D. C., Ralph E. Erickson, Los Angeles, Cal., John R. Ferguson, Rudolph W. Giuliani, Robert B. Hummel, Owen M. Johnson, Thomas F. Kauper, Edward H. Levi, Michael R. McQuinn, Gerald P. Norton, Jonathan C. Rose, William D. Ruckelshaus, Antonin Scalia, Laurence H. Silberman, Joe Sims, William E. Swope, Donald F. Turner, Washington, D. C., Harold R. Tyler, Jr., New York City, Alan S. Ward, Washington, D. C., of counsel), for certain lawyers as amici curiae.

Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.*

FEINBERG, Circuit Judge (with whom KAUFMAN, Chief Judge, and MANSFIELD, OAKES and TIMBERS, Circuit Judges, concur):

In this en banc proceeding, we are called upon to consider two significant issues: the appealability of orders denying a motion to disqualify an attorney and the standard to be applied by the trial judge in ruling upon such motions. Clovis McAlpin and Capital Growth Real Estate Fund, Inc., two of numerous defendants in a suit seeking over $24 million for violation of federal securities laws, appeal from an order of the United States District Court for the Southern District of New York, Henry F. Werker, J., denying their motion to disqualify the law firm representing plaintiffs. The appeal was first heard by a panel of this court, which concluded that the trial judge had erred in denying defendants' disqualification motion. 606 F.2d 28 (2d Cir. 1979). A majority of this court voted to grant en banc reconsideration of the appeal, and di-

---

* The order granting en banc reconsideration of this appeal was filed on December 12, 1979. Judge Gurfein, who was a member of the en banc court, unfortunately died on December 16, 1979. Prior to his death, he did not have the opportunity to vote on the merits of the appeal. Judge Kearse, subsequent to December 12, 1979, disqualified herself.

rected the parties to brief both the merits of the appeal and also the question whether an order granting or denying a disqualification motion should be appealable. Subsequently, the parties and a number of amici filed comprehensive briefs on the issues before the en banc court. After full consideration, we affirm the order of the district court and vacate the earlier decision of the panel. We also hold that henceforth orders denying disqualification motions will not be appealable, thus overruling our en banc decision in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 496 F.2d 800 (2d Cir. 1974). The reasons for these rulings are fully set forth below.

## I. *The Facts*

Appellants' motion to disqualify is based on the prior participation of Theodore Altman, now a partner in the law firm representing plaintiffs-appellees, in an investigation of and litigation against appellants conducted when he was an Assistant Director of the Division of Enforcement of the Securities and Exchange Commission (the SEC). In September 1974, after a nine-month investigation, the SEC commenced an action in the United States District Court for the Southern District of New York against Clovis McAlpin and various other individual and institutional defendants. The complaint alleged that McAlpin and the other defendants had looted millions of dollars from a group of related investment companies, referred to here collectively as the Capital Growth companies; McAlpin was the top executive officer of these companies. The SEC suit sought, among other things, the appointment of a receiver to protect the interests of shareholders in the Capital Growth companies. When McAlpin fled to Costa Rica and certain other defendants failed to appear, the SEC obtained a default judgment; in September 1974, Judge Charles E. Stewart appointed Michael F. Armstrong, the principal appellee in this appeal, as receiver of the Capital Growth companies. See *SEC v. Capital Growth Company, S. A. (Costa Rica) et al.*, 391 F.Supp. 593 (S.D.N.Y.1974).

One of Armstrong's principal tasks as receiver for the Capital Growth companies is to recover all moneys and property misappropriated by defendants; to further this task, Armstrong was authorized to initiate litigation in the United Statess and abroad. In October 1974, Judge Stewart granted Armstrong's request to retain as his counsel the New York firm of Barrett Smith Schapiro & Simon.[1] Shortly after the appointment of Armstrong, the SEC made its investigatory files available to him, in accordance with its practice, we are informed in its brief, of assisting "the efforts of receivers who have been appointed by the courts in Commission law enforcement actions." Cf. *SEC v. Everest Management Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972). The Barrett Smith firm reviewed these files, conducted its own investigation for the receiver, and assisted him in taking possession of various Capital Growth properties in the continental United States and in Puerto Rico. For the next year and a half, we are told, Barrett Smith devoted approximately 2,600 hours to assisting the receiver, which included the services of five partners and eight associates; a little over half of this time was spent preparing for litigation.

In early 1976, however, the receiver and Barrett Smith became aware of a potential conflict of interest involving an institutional client of Barrett Smith that might become a defendant in litigation brought by the receiver. Thus, despite Barrett Smith's substantial investment of time, the receiver concluded that it was necessary to substitute litigation counsel. The task, however, was not an easy one; McAlpin had fled to Costa Rica with most of the assets of the Capital Growth companies and hence the funds available to Armstrong to secure new counsel were quite limited.[2] It was therefore necessary to find a firm that could not only handle difficult litigation in Costa Rica and in the United States, but would also

---

1. Armstrong was a partner of that firm, which is now Barrett Smith Schapiro Simon & Armstrong.

2. Cash on hand was then about $200,000; it is apparently not much more now.

commit itself to conclude the task, even if little or no interim compensation was available.[3] Moreover, it was important to retain a law firm large enough to cope with the immense paper work soon to be generated by the firms that would probably represent the institutional defendants.[4]

Because of these considerations, appellees assert, the receiver focused on firms already involved in litigation against Robert L. Vesco, who, like McAlpin, had fled to Costa Rica rather than face possible prosecution for numerous alleged securities fraud violations. After abortive negotiations with two such firms, the receiver in April 1976 retained the law firm of Gordon Hurwitz Butowsky Baker Weitzen & Shalov, the firm that is the target of appellants' disqualification motion. According to Armstrong, the Gordon firm was chosen in part because one partner, David M. Butowsky, was then Special Counsel to International Controls Corporation and was involved in legal work in Costa Rica relating to the alleged Vesco defalcations, while another partner had specialized experience in prosecuting complex fraud cases. In accepting the representation, the Gordon firm agreed to "conduct all Capital Growth litigation through to a conclusion" even if the receiver could not compensate the firm as the litigation progressed.

In October 1975, some seven months before the receiver obtained substitute counsel for Barrett Smith, Theodore Altman ended his nine-year tenure with the SEC to become an associate with the Gordon firm. At the time of his resignation, Altman had been an Assistant Director of the Division of Enforcement for three years, and had about twenty-five staff attorneys working under him. As a high-ranking enforcement officer of the SEC, Altman had supervisory responsibility over numerous cases, including the Capital Growth investigation and litigation. Although he was not involved on a daily basis, he was generally aware of the facts of the case and the status of the litigation. The SEC's complaint was prepared and filed by the staff of the New York Regional Administrator, and the litigation was handled by the New York office. Altman's name appeared on the SEC complaint, although he did not sign it.

At the time that Altman joined the Gordon firm, the receiver had no reason to know that Altman had left the SEC or to be aware of his new affiliation. Subsequently, during the initial meetings with the Gordon firm, Armstrong first learned that Altman had recently become associated with the firm. Both the Gordon firm and Barrett Smith researched the question of the effect of Altman's prior supervisory role in the SEC suit. The two firms concluded that under applicable ethical standards discussed in Part IV of this opinion, Altman should not participate in the Gordon firm's representation of the receiver, but that the firm would not be disqualified if Altman was properly screened from the case. The matter was brought to the attention of Judge Stewart, who nonetheless authorized the receiver to retain the Gordon firm. Shortly thereafter, the firm asked the SEC if it had any objection to the retention, and was advised in writing that it did not, so long as Altman was screened from participation. Barrett Smith then turned over its litigation files to the Gordon firm, including those received from the SEC; in September 1976, the receiver filed the action by plaintiffs-appellees against defendants-appellants that gave rise to this appeal.[5]

In June 1978, almost two years after the commencement of this action, appellants

---

**3.** Up to that time, neither Barrett Smith nor the receiver had been awarded any fees; subsequently, there were some interim allowances for Barrett Smith but Armstrong as yet has received no compensation.

**4.** After the receiver's complaint was subsequently filed, some of the largest and most prestigious New York firms appeared for the various defendants.

**5.** A more complete statement of the underlying facts in this action is set forth in *Armstrong v. McAlpin*, [1978 Transfer Binder] Fed.Sec.L. Rep. ¶ 96,323 (S.D.N.Y.1978), which deals with defendants' motion to dismiss the amended complaint.

filed their motion to disqualify the Gordon firm because of Altman's prior activities at the SEC. In December 1978, Judge Werker, to whom the case had been reassigned, denied the motion. In his opinion, the judge concluded that the Gordon firm had carried out the letter and spirit of the relevant bar association ethical rulings, that the firm's representation of the receiver was not unethical and did not threaten the integrity of the trial, and that appellants had suffered no prejudice as a result of the representation. 461 F.Supp. 622 (S.D.N.Y. 1978). As already indicated, in September 1979 a panel of this court reversed the decision of the district court; in December 1979, this en banc proceeding was ordered and a briefing schedule fixed. We now turn to the issues before us.

## II. *Appealability*

On our own motion, we asked the parties to brief the question of appealability because we have become concerned over the practical effects of our decision six years ago in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 496 F.2d 800 (2d Cir. 1974) (en banc), which overruled our prior practice and allowed immediate appeals from orders denying disqualification. That concern now leads us to re-examine the conceptual basis of *Silver Chrysler.*

As we pointed out recently in *Eckles v. Furth*, 557 F.2d 953, 955 (2d Cir. 1977), "[t]he appealability of disqualification orders has had a checkered history in this court." Before *Silver Chrysler*, orders granting a motion to disqualify were generally held to be appealable, albeit without much discussion. See, e. g., *W. E. Basset Co. v. H. C. Cook Co.*, 302 F.2d 268 (2d Cir. 1962) (per curiam). The rationale was stated to be that "[a]n order granting disqualification seriously disrupts the progress of the litigation and decisively sullies the reputation of the affected attorney . . . ." *Fleischer v. Phillips*, 264 F.2d 515, 517 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959). On the other hand, orders denying a motion to disqualify were usually viewed as nonappealable. Id. However, our unanimous en banc opinion in *Silver Chrysler* changed the latter rule so that orders granting and orders denying disqualification motions were henceforth both immediately appealable as a matter of right.

The result of obtaining that surface symmetry soon manifested itself. In recent opinions, many members of this court have noted that the availability of an immediate appeal has seemingly contributed to the proliferation of disqualification motions and the use of such motions for purely tactical reasons, such as delaying the trial. See, e. g., *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977); [6] *W. T. Grant Co. v. Haines*, 531 F.2d 671, 677–78 (2d Cir. 1976); [7] *Lefrak v. Arabian American Oil Co.*, 527 F.2d 1136, 1138–39 (2d Cir. 1975); [8] *J. P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir. 1975) (Gurfein, J., concurring); see also Van Graafeiland, Lawyer's Conflict of Interest—A Judge's View (Part II), N.Y.L.J., July 20, 1977, p. 1, col. 2. While we cannot determine with precision the amount of the increase in such motions, we are left with the clear impression that they have substantially grown in number.[9] More signifi-

---

**6.** The panel consisted of Judges Lumbard, Oakes and Meskill.

**7.** The panel consisted of Judges Anderson, Feinberg and Mulligan.

**8.** The panel consisted of Judges Mulligan, Van Graafeiland and Meskill.

**9.** As to the accuracy of this impression, we note that the "position" Judge Mulligan has taken is, in his words, "one of tergiversation." Despite his present view, not long ago he observed that "[s]ince this court has reversed our prior rule and held that denials of motions to disqualify counsel are directly appealable to

this court . . . such motions and appeals have proliferated." *W. T. Grant Co.*, supra, 531 F.2d at 677–78; see also *Lefrak*, supra, 527 F.2d at 1138–39. In any event, we continue to believe that the use of disqualification motions has increased. For its statistical analysis, the dissent relies primarily on eleven opinions of this court published in the six-year period since *Silver Chrysler*. However, the number of published opinions is an inadequate measure of the prevalence of appeals (particularly meritless ones) from denials of disqualification motions, for it fails to account for the substantial number of appeals that are dismissed prior to a hearing on the merits or are disposed of by a

cantly, we see in microcosm in this appeal the practical effect on the progress of a litigation of a rule allowing appeals from denials of disqualification motions. Since June 1978, when appellants moved to disqualify the Gordon firm, the litigation in the district court has been frozen in its tracks. We recognize that the en banc procedure has inevitably contributed to the period of delay, but the bulk of the delay has stemmed from the initial appeal of the denial of disqualification. Such a prolonged interruption in a litigation charging serious abuses of the securities laws raises grave questions of judicial administration. And while such concerns by themselves do not justify a conclusion that *Silver Chrysler* was improperly decided, they do suggest that a careful reconsideration of the issue of appealability is appropriate. That reconsideration, we find, reveals that the conceptual basis of *Silver Chrysler* was flawed.

The basis of our decision in *Silver Chrysler* was that appeals from denials of disqualification motions fell within the narrow exception to the final judgment rule recognized by the Supreme Court in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). *Cohen* held that certain orders were immediately appealable (1) if they were collateral to the merits; (2) if denial of an immediate appeal would result in irreparable damage to the party seeking review; and (3) if the issue raised was "too important" to "be deferred until the whole case is adjudicated." In concluding that denials of disqualification motions were immediately appealable, *Silver Chrysler* simply noted that "[a]ll three prerequisites of *Cohen* are met" without providing any detailed analysis. 496 F.2d at 805. While it is clear that rulings on disqualification motions are collateral to the merits, thus satisfying the first require-

ment of *Cohen*, the second and third requirements are not so easily disposed of.

With regard to the adequacy of review on appeal after final judgment, *Silver Chrysler* flatly concludes that it would be "fatuous to suppose that [such] review . . . will provide adequate relief." 496 F.2d at 805. It is true that a party whose disqualification motion is denied will be forced, if denied an immediate appeal, to bear the time and expense involved in a trial that may possibly be tainted. Nonetheless, we do not think the harm caused by erroneous denial of a disqualification motion differs in any significant way from the harm resulting from other interlocutory orders that may be erroneous, such as orders requiring discovery over a work-product objection or orders denying motions for recusal of the trial judge. In those situations, we have held that no immediate appeal is available as a matter of right. *American Express Warehousing, Ltd. v. Transamerica Ins. Co.*, 380 F.2d 277, 281–82 (2d Cir. 1967); *Rosen v. Sugarman*, 357 F.2d 794, 796 (2d Cir. 1966). Moreover, the harm caused by an erroneous denial of a disqualification motion is usually not irreparable since this court retains its traditional power to grant a new trial if the district court's ruling ultimately turns out to be incorrect. Furthermore, in those rare cases where irreparable harm is truly threatened, an immediate appeal might be available through certification pursuant to section 1292(b) or, possibly, through a writ of mandamus. See Note, The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts, 45 U.Chi.L.Rev. 450, 468–80 (1978) (hereafter referred to as Chicago Note). Finally, it should be remembered that the trial judge also retains power to protect the trial against taint, either

---

summary order of affirmance. We have no doubt that a careful canvassing of these cases since 1974 would reveal a significant number of appeals from denials of disqualification motions. Thus, a cursory examination of calendared appeals terminated during one year of the six-year period revealed three such cases. See *Kennecott Copper Co. v. Curtiss-Wright Corp.*, 78–7165 (appeal withdrawn December

19, 1978); *CITC Industries, Inc. v. Manow Int'l Corp.*, 584 973 (2d Cir. 1978); *Banque de Financement, S. A. v. Interphoto Corp.*, 591 F.2d 1329 (2d Cir. 1978). We remain convinced that appeals from denials of disqualification motions are neither as scarce nor as meritorious as Judge Mulligan's dissent assumes.

through the issuance of protective orders or, if necessary, through reconsideration of the need for disqualification.[10]

■ Similarly, we now think that *Silver Chrysler* misconstrued the third *Cohen* requirement that the issue be "too important to be denied review" by an immediate appeal. *Cohen* dealt with the legal issue whether defendants in stockholder derivative actions had the right to require plaintiffs to post security for costs; the Court, however, specifically noted that its decision did not mean that "every order fixing security is subject to appeal." 337 U.S. at 547, 69 S.Ct. at 1226. Thus, the *Cohen* exception to the final judgment rule appears to have been primarily, though perhaps not exclusively, directed towards interlocutory appeals raising potentially decisive legal, as opposed to factual, questions.[11] In contrast, most disqualification motions involve primarily factual, rather than legal, determinations, e. g., is there a threat of taint; is the screening adequate; is there a "substantial relationship" between prior and present representations. Such determinations therefore do not usually present "serious and unsettled question[s]" within the meaning of *Cohen*. 337 U.S. at 547, 69 S.Ct. at 1226. Cf. *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 773 (2d Cir. 1972); *Donlon Industries, Inc. v. Forte*, 402 F.2d 935, 937 (2d Cir. 1968). Furthermore, in disqualification cases that do raise important and unresolved legal issues, immediate review under section 1292(b) or by mandamus might be available.[12] See *Community Broadcasting of Boston, Inc. v. F.C.C.*, 546 F.2d 1022, 1028 & n. 40 (D.C.Cir. 1976). Finally, we do not think that the public importance of the ethical questions raised by disqualification motions requires the right to an immediate appeal. The normal appellate process, coupled with the judicious use of certification and mandamus, is perfectly adequate to vindicate this interest, as

10. Of course, our discussion of the potential harm to a party whose disqualification motion is denied assumes that the denial was erroneous. In an analogous situation, however, we have stressed that a significant safeguard against irreparable harm to the parties is the "wise discretion of experienced trial judges." *American Express, supra*, 380 F.2d at 282.

11. While the issue is perhaps not settled, we disagree with Judge Mulligan's conclusion that the legal significance of the issues sought to be raised on appeal is not relevant to a determination of whether an order is appealable under *Cohen*. As noted in the text, the language of *Cohen* clearly implies that such a factor should be considered. Moreover, at least half the circuits have joined this court in construing *Cohen* generally to require consideration of the legal and public significance of the issues raised by the district court's order. See, e. g., *Steering Comm. v. Mead Corp.*, 611 F.2d 86, 87 (5th Cir. 1980); *Jicarilla Apache Tribe v. United States*, 601 F.2d 1116, 1124 (10th Cir.), cert. denied, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); *First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390, 393 (7th Cir.), rev'd en banc on other grounds, 584 F.2d 201 (1978); *Van-S-Aviation Corp. v. Piper Aircraft Corp.*, 551 F.2d 213, 217 (8th Cir. 1977); *Grinnell Corp. v. Hackett*, 519 F.2d 595, 597–98 & n. 4 (1st Cir.) (criticizing *Silver Chrysler* on this ground), cert. denied sub nom. *Chamber of Commerce v. United Steelworkers of America*, 423 U.S. 1033, 96 S.Ct. 566, 46 L.Ed.2d 407 (1975). See also 9 Moore's Federal Practice

' 110.10 (2d ed. 1975); Chicago Note, supra, at 461–64. And while it is of course true that the *Cohen* rule has been applied to permit immediate appeals from some orders involving primarily factual as opposed to legal issues, such cases often involve the threatened destruction of very important, and in some cases constitutional rights. See, e. g., *Abney v. United States*, 431 U.S. 651, 656–62, 97 S.Ct. 2034, 2038–41, 52 L.Ed.2d 651 (1977) (double jeopardy claim); *Stack v. Boyle*, 342 U.S. 1, 6–7, 72 S.Ct. 1, 4, 96 L.Ed. 3 (1951) (order refusing to reduce bail); *Roberts v. United States District Court*, 339 U.S. 844, 70 S.Ct. 954, 94 L.Ed. 1326 (1950) (order denying leave to proceed in forma pauperis). In such circumstances, the threat of irreparable harm alone is sufficient to justify the right to an immediate appeal. However, in cases such as this, where the likelihood of irreparable harm is hardly so certain, a court considering the question of appealability should also give attention to the importance of the legal issues being raised.

12. In this regard, it is important to note that the certification procedure now embodied in 28 U.S.C. § 1292(b) was not available at the time of the *Cohen* decision.

It should also be remembered that special rules govern appealability in bankruptcy proceedings, the category of cases which appear to be of particular concern to Judge Mulligan. See, e. g., *In re Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir. 1979).

it has been held to be in the related, but more serious, situation when a district judge has denied a motion for his recusal. See *Rosen,* supra, 357 F.2d 794.

Thus, because we conclude that the requirements of *Cohen* are not met, we overrule *Silver Chrysler* and hold that orders denying disqualification motions are not immediately appealable.[13] We realize that in doing so we part company with several circuits that have accepted the *Silver Chrysler* rule. See, e. g., *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706 (7th Cir. 1976); *Fullmer v. Harper,* 517 F.2d 20 (10th Cir. 1975). However, we are more persuaded by the arguments against the *Silver Chrysler* rule raised by other courts, see, e. g., *In re Multi-Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.) (en banc), cert. granted sub nom. *Firestone Tire & Rubber Co. v. Risjord,* —— U.S. ——, 100 S.Ct. 2150, 64 L.Ed.2d —— (1980);[14] *Melamed v. ITT Continental Baking Co.,* 592 F.2d 290 (6th Cir. 1970); *Community Broadcasting,* supra, 546 F.2d 1022, and by such commentators as Professor Moore. See 9 Moore's Federal Practice, ¶ 110.13[10] at p. 190 (2d ed. 1975) (approving 2d Circuit pre-*Silver Chrysler* rule).

▮ We do not reach the same conclusion, however, with respect to orders *granting* disqualification motions. In such cases, the losing party is immediately separated from counsel of his choice. If the order is erroneous, correcting it by an appeal at the end of the case might well require a party

---

**13.** In concluding that orders denying disqualification motions are not immediately appealable under *Cohen,* we have considered and rejected the rule of apparently limited appealability suggested in Judge Mulligan's dissent on this issue. Under this constricted reading of *Silver Chrysler,* only those orders denying disqualification that "involv[e] the integrity of the trial" are immediately appealable. At 449. We regard this approach to jurisdiction, however, as vague and unworkable. Such a rule would necessarily involve a detailed examination of the merits of each appeal in order to determine whether the threshold criterion of appealability—a possible threat to the integrity of the trial—is present. Moreover, the inquiry to determine jurisdiction would duplicate the inquiry necessary to resolve the issue on the merits under the substantive standards of this court. See section IV infra. Judge Mulligan's dissent asserts that such careful scrutiny is unnecessary and that a cursory "consideration of which Disciplinary Rule is implicated" will generally suffice to screen out improper appeals. At 449 n. 3. We are unpersuaded, however, for several reasons. Claims of unethical conduct are varied and often complex, and the extent to which such allegations, if true, implicate the integrity of the trial simply cannot be accurately determined by a mechanical reference to which Disciplinary Rules are mentioned in appellant's brief. Moreover, we should not underestimate the ability of the "artful movant . . . to force unwarranted expenditure of judicial and opponent resources" by casting his appeal in terms of threat of taint where none exists. Chicago Note, supra, at 467–68. And when an appellant does so argue, in the face of a contrary ruling by the district court, this court would be faced with two equally unattractive options in making the necessary preliminary determination on the merits to decide whether jurisdiction exists to determine the merits: either devote much time and effort to deciding appealability or adopt a lax approach to the issue. Thus, the proposed rule would either pose major administrative problems or be an ineffective bar to frivolous appeals.

The present case, if anything, proves the point. Appellants vigorously urge taint, claiming that the use of screening is improper in this case, that the screening has already been violated, and that the trial will be tainted if the Gordon firm continues as the receiver's counsel. The district court, after a careful analysis, rejected appellant's claim that the integrity of the trial was threatened, and the panel of this court that originally heard the appeal did not disturb that finding. Judge Newman, the author of that panel opinion, now believes that a threat of taint may exist, at 445, but the majority of the en banc court has concluded that the district court correctly found that the integrity of the trial was not threatened. If, after full consideration by the district court, the panel, and the en banc court, there is still disagreement over whether a threat of taint exists, can it reasonably be assumed that examination of the question of taint for the purposes of ascertaining jurisdiction will prove a simpler and more straightforward task? We think not, and instead believe that the test of jurisdiction should be less elusive.

**14.** Certiorari was granted in *Firestone Tire* after the en banc order in this case had been issued and the proposed en banc majority opinion had been circulated. Since seven of the nine active judges considering this en banc appeal do not approve of the rule of appealability announced in *Silver Chrysler,* we believe that we should make known our current view.

to show that he lost the case because he was improperly forced to change counsel. This would appear to be an almost insurmountable burden. In addition, permitting an immediate appeal from the grant of a disqualification motion does not disrupt the litigation, since the trial must be stayed in any case while new counsel is obtained. Moreover, the grant of a disqualification motion may effectively terminate the litigation if the party whose counsel is disqualified cannot afford to hire new counsel to begin the litigation anew. Such considerations are obviously pertinent, for example, in this case. See notes 2–3 and accompanying text supra. Furthermore, the granting of a disqualification motion by a district judge is a fair indication that a nonfrivolous issue has been raised; there is no similar assurance that appeals from denials of disqualification motions will raise a substantial question. Thus, it is far less likely that appeals from orders granting disqualification motions will be taken purely for tactical reasons. Finally, disqualification often impairs the reputation of the disqualified firm or attorney, and this injury may never be corrected on appeal if the party is satisfied with the performance of his new counsel. For all these reasons, we now agree with then Chief Judge Clark's view, expressed well before *Silver Chrysler*, that grants of disqualification motions are more important and potentially more harmful than denials of such motions and should therefore be immediately appealable as a matter of right. See *Fleischer v. Phillips*, supra, 264 F.2d at 517.[15]

### III. *Advisability of reaching merits*

Since we conclude that orders denying disqualification motions are not immediately appealable, it would ordinarily be appropriate for us merely to dismiss the appeal in this case and allow the litigation to continue in the district court to its conclusion. At that time, of course, the defendants could appeal any adverse judgment to this court and could raise, among other things, the argument that Judge Werker's failure to disqualify the Gordon firm prejudiced them and that therefore the judgment should be reversed. Nevertheless, we believe there are strong reasons in the unusual context of this case to reach the merits of the appeal rather than to dismiss it.

We note, to begin with, that in *In re Multi-Piece Rim Products Liability Litigation*, supra, 612 F.2d at 379, and in *Melamed v. ITT Continental Baking Co.*, supra, 592 F.2d at 295, the Eighth and Sixth Circuits both held denials of disqualification motions to be nonappealable but nonetheless decided the merits of the appeals before them. Moreover, given the procedural posture of this case, there are particularly compelling reasons to reach the merits. First, a refusal to do so will leave the law of the circuit on attorney disqualifications in a muddled state. Although the effect of our en banc decision will be to vacate the panel's earlier decision in this case, the panel's opinion will nonetheless suggest that this circuit is split on the applicable standard for disqualification motions, particularly when the panel decision is read in conjunction with *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979). In addition, if we hold denials of such motions to be nonappealable but do not resolve the substantive question here presented, we shall effectively cut the district courts adrift, with no clarification of the law of the circuit, and a greatly diminished opportunity in the future to obtain

---

**15.** We recognize the force of Judge Mulligan's claim that some inconsistency exists between our conclusion that denials of disqualification motions are not immediately appealable while grants of such motions are. However, legal rules do not depend on logic alone. The final judgment rule embodied in 28 U.S.C. § 1291 should be given a "practical rather than technical construction," *Cohen*, supra, 337 U.S. at 546, 69 S.Ct. at 1226, and, as we have noted, the practical consequences of granting a disqualification motion are sufficiently more serious and final than those stemming from the denial of such a motion that the right to an immediate appeal in the former case is justified. Thus, along with all the other circuits that have held denials of disqualification motions not to be immediately appealable, we are willing to endure whatever appearance of inconsistency arises from an opposite conclusion regarding the appealability of grants of disqualification motions.

necessary guidance. Moreover, failure to reach the merits will leave the district court supervising this litigation in a particularly untenable position; it must either adhere to its original ruling and proceed with a law firm that a panel of this court has said should not be in the case, or it must rescind its prior ruling and disqualify the firm, thereby precipitating another pretrial appeal, which might well result in reversal by a different panel. Finally, it would be an enormous waste of judicial resources simply to dismiss the appeal, now that all judges of the court have had an opportunity to consider the merits and defendants will undoubtedly appeal the identical issue if they are unsuccessful at trial.

Accordingly, we conclude that we should address the merits of the appeal before us.

### IV. *The Merits*

In his thorough opinion refusing to disqualify the Gordon firm, Judge Werker reviewed the facts set forth in Part I of this opinion and carefully analyzed the ethical problem defendants had raised. He noted that Altman was concededly disqualified from participating in the litigation under Disciplinary Rule 9–101(B) of the American Bar Association Code of Professional Responsibility. That Rule prohibits an attorney's private employment in any matter in which he has had substantial responsibility during prior public employment.[16] The judge then considered the effect of Disciplinary Rule 5–105(D), which deals with disqualification of an entire law firm if one lawyer in the firm is disqualified.[17] This issue had been considered by both the American Bar Association (the ABA) and the Committee on Professional and Judicial Ethics of The Association of the Bar of the City of New York (the Association). The ABA, in its Formal Opinion No. 342, had recognized that "[p]ast government employment creates an unusual situation in which

an inflexible application of D.R. 5–105(D) would actually thwart the policy considerations underlying D.R. 9–101(B)," 62 ABA Journal 517, 520 (1976), and concluded that, absent an appearance of significant impropriety, a government agency could waive Rule 5–105(D), if adequate screening procedures effectively isolated the former government lawyer from those members of his firm handling the matter. Id. at 521. The Association similarly rejected an absolute rule of disqualification for a law firm because of disqualification of a former government attorney, if the latter is "effectively isolated from the handling of [the] matter." Opinion No. 889, 31 The Record 552, 566 (1976).

Judge Werker then carefully examined the screening of Altman by the Gordon firm, noting that:

> Altman is excluded from participation in the action, has no access to relevant files and derives no remuneration from funds obtained by the firm from prosecuting this action. No one at the firm is permitted to discuss the matter in his presence or allow him to view any document related to this litigation, and Altman has not imparted any information concerning Growth Fund to the firm.
>
> .   .   .   .   .
>
> [N]othing before this court indicates that Altman, while employed by the SEC, formed an intent to prosecute a later action involving Growth Fund. Indeed, sworn affidavits reveal that he has never participated in any fashion whatever in the Gordon firm's representation of the Receiver, nor has he shared in the firm's income derived from prosecution of this action. And  .  .  .  Altman and his two partners Velie and Butowsky have attested under penalty of perjury that Altman has never discussed the action with other firm members. These state-

---

**16.** Disciplinary Rule 9–101(B) provides:

A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

**17.** Disciplinary Rule 5–105(D) provides:

If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

ments are uncontradicted by defendants and provide a basis for *not* imputing Altman's knowledge to other members of the firm.

461 F.Supp. at 624–25 (emphasis in original). Under all the circumstances, the district judge concluded that "the proper screening of Altman rather than disqualification of the Gordon firm is the solution to the present dispute." Id. at 626. Accordingly, the motion to disqualify was denied. On appeal, as already indicated, a panel of this court reversed the order of the district court, apparently on the ground that disqualification was required "as a prophylactic measure to guard against misuse of authority by government lawyers." 606 F.2d at 34.

On this rehearing en banc, we are favored with briefs not only from the parties but also from the United States,[18] the Securities and Exchange Commission, the Interstate Commerce Commission, the Federal Maritime Commission, the Commodities Futures Trading Commission and twenty-six distinguished former government lawyers now employed as practicing attorneys, corporate officers, or law professors, all attesting to the importance of the issues raised on appeal. Thus, the United States asserts that a "decision to reject screening procedures is certain to have a serious, adverse effect on the ability of Government legal offices to recruit and retain well-qualified attorneys"; this view is seconded by the other government amici. And the former government lawyers, including two former Attorneys General of the United States and two former Solicitors General of the United States, state that they are all "affected at least indirectly, by the panel opinion's underlying assumption that government law-

yers cannot be trusted—trusted to discharge their public responsibilities faithfully while in office, or to abide fully by screening procedures afterwards." While the tone of these assertions may be overly apocalyptic, it is true that a decision rejecting the efficacy of screening procedures in this context may have significant adverse consequences. Thus, such disapproval may hamper the government's efforts to hire qualified attorneys; the latter may fear that government service will transform them into legal "Typhoid Marys,"[19] shunned by prospective private employers because hiring them may result in the disqualification of an entire firm in a possibly wide range of cases. The amici also contend that those already employed by the government may be unwilling to assume positions of greater responsibility within the government that might serve to heighten their undesirability to future private employers. Certainly such trends, if carried to an extreme, may ultimately affect adversely the quality of the services of government attorneys.

Not only is the panel decision possibly of great practical importance, the ethical issues it addresses are also complex and are currently being hotly contested by various groups. As previously noted, the ABA in its Formal Opinion No. 342 and the Association of the Bar of the City of New York both approved the use of screening devices in the case of former government attorneys; the Administrative Conference of the United States has also recently sanctioned the use of screening.[20] In contrast, an ABA committee in a recent draft proposal for Model Rules of Professional Conduct apparently omits any provision for relief from disqualification through screening.[21] The

**18.** The brief of the United States also states that it presents the views of the Federal Trade Commission, the Civil Aeronautics Board, the Federal Energy Regulatory Commission, and the Federal Legal Council, a committee consisting of the General Counsels of fifteen executive branch agencies and chaired by the Attorney General of the United States.

**19.** *Kesselhaut v. United States*, 555 F.2d 791, 793 (Ct.Cl.1977) (per curiam).

**20.** See Administrative Conference of the United States, Recommendation 79–7 (Dec. 14, 1979), reprinted in Legal Times of Washington, Dec. 31, 1979, at 27.

**21.** ABA Commission on Evaluation of Professional Standards, Discussion Draft of the Model Rules of Professional Conduct § 1.11 (Jan. 30, 1980), reprinted in U.S.L.W., vol. 48, no. 32 (Feb. 19, 1980).

issues thus raised have also provoked significant scholarly commentary. See, e. g., Kaufman, The Former Government Attorney and the Canons of Professional Ethics, 70 Harv.L.Rev. 657 (1957); Lacovara, Restricting the Private Practice of Former Government Lawyers, 20 Ariz.L.Rev. 369 (1978); Note, The Chinese Wall Defense to Law-Firm Disqualification, 128 U.Pa.L.Rev. 677 (1980) and commentary collected at nn. 9 & 16 (hereafter referred to as Pennsylvania Note); Note, Ethical Problems for the Law Firm of a Former Government Attorney: Firm or Individual Disqualification, 1977 Duke L.J. 512; Comment, Conflicts of Interest and the Former Government Attorney, 65 Geo.L.J. 1025 (1977).

We do not believe that it is necessary or appropriate for this court to enter fully into the fray, as the panel opinion did.[22] Indeed, the current uncertainty over what is "ethical" underscores for us the wisdom, when considering such issues, of adopting a restrained approach that focuses primarily on preserving the integrity of the trial process. We expressed this view in *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979), in which we reviewed at length our precedents on attorney disqualification and pointed out:

> Our reading of the cases in this circuit suggests that we have utilized the power of trial judges to disqualify counsel where necessary to preserve the integrity of the adversary process in actions before them. In other words, with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, . . . or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior

representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage . . . . But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct. . . . This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons. . . . And even when made in the best of faith, such motions inevitably cause delay.

Id. at 1246 (citations and footnotes omitted). Judge Mansfield, concurring in *Nyquist*, pointed out that a trial could also be tainted because:

> . . . the former Government attorney might in the later private action use information with respect to the matter in issue which was gained in confidence as a public employee and was unavailable to the other side.

Id. at 1247 n. 1. We ended our review in *Nyquist* by adopting a restrained approach to disqualification.

> Weighing the needs of efficient judicial administration against the potential advantage of immediate preventive measures, we believe that unless an attorney's conduct tends to "taint the underlying trial", . . . by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney. Given the availability of both federal and state comprehensive disciplinary machinery, see, e. g., Local Rules of the United States Court of Appeals for the Second Circuit § 46(h) (1978), there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface. See *Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136,

---

**22.** Judge Newman, dissenting from this portion of the en banc opinion, asserts that the present provisions of the Code of Professional Responsibility should be "appl[ied] as written." At 454. We regard this "plain meaning" approach to disqualification motions to be particularly ill-advised in light of the continuing uncertainty and disagreement over the meaning and application of the Code's provisions.

1141 (2d Cir. 1975); *Ceramco, Inc. v. Lee Pharmaceuticals*, supra, 510 F.2d [268] at 271 [2d Cir.]. Cf. *United States v. Pastore*, 537 F.2d 675 (2d Cir. 1976). Id. at 1246 (citation omitted).

We believe that this approach is dispositive here and requires our affirmance of the ruling of the district court. It is apparent from a close reading of Judge Werker's opinion that he saw no threat of taint of the trial by the Gordon firm's continued representation of the receiver. Nor did the panel opinion in this case challenge that view. Although appellants assert that the trial will be tainted by the use of information from Altman, we see no basis on the record before us for overruling the district court's rejection of that claim.[23] Using the *Nyquist* analysis, there is certainly no reason to fear any lack of "vigor" by the Gordon firm in representing the receiver; this is not a case where a law firm, by use of a "Chinese wall," is attempting to justify representation of conflicting interests at the same time. Cf. *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977); *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976). See also Pennsylvania Note, supra, at 684–85, 687–91, 715. Nor is the Gordon firm "potentially in a position to use privileged information" obtained through prior representation of the other side. And finally, the receiver will not be making unfair use of information obtained by Altman as a government official, since the SEC files were turned over to the receiver long before he retained the Gordon firm and Altman has been entirely screened from all participation in the case, to the satisfaction of the district court and the SEC.[24] Nor is there any reason to believe that the receiver retained the Gordon firm because Altman was connected with it[25] or that Altman had anything to do with the retention. If anything, the presence of Altman as an associate at that time was a problem, not a benefit, for the Gordon firm, as the district court, the receiver and the Gordon firm all apparently recognized.

Thus, because the district court justifiably held that the Gordon firm's representation of the receiver posed no threat to the integrity of the trial process, disqualification of the firm can only be based on the possible appearance of impropriety stemming from Altman's association with the firm. However, as previously noted, reasonable minds may and do differ on the ethical propriety of screening in this context. But there can be no doubt that disqualification of the Gordon firm will have serious consequences for this litigation; separating the receiver from his counsel at this late date will seriously delay and impede, and perhaps altogether thwart, his attempt to obtain redress for defendants' alleged frauds. Under the circumstances, the possible "appearance of impropriety is simply too slender a reed on which to rest a disqualification order . . . particularly . . . where . . . the appearance of impropriety is not very clear." *Nyquist*, supra, 590 F.2d at 1247. Thus, we need not resolve the ethical propriety of the screening procedure used here at this time as long as the district court justifiably regarded it as effective in isolating Altman from the litigation.

We recognize that a rule that concentrates on the threat of taint fails to correct all possible ethical conflicts. In adopting this approach, we do not denigrate the importance of ethical conduct by attorneys

**23.** Judge Newman, author of the panel opinion, now asserts that the trial may be tainted if the Gordon firm continues as receiver's counsel. However, as we state in the text, we perceive no basis in the record for overruling the district court on this issue.

**24.** The case therefore is entirely distinguishable from *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974), where an attorney who had substantial responsibility over an antitrust litigation against General Motors Corporation while he was employed by the Antitrust Division of the Justice Department later accepted employment as plaintiff's attorney in a private antitrust action against the same defendant for substantially the same conduct.

**25.** Altman was then an associate, although he is now a partner.

practicing in this courthouse or elsewhere, and we applaud the efforts of the organized bar to educate its members as to their ethical obligations. However, absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the "comprehensive disciplinary machinery" of the state and federal bar, see *Nyquist,* supra, 590 F.2d at 1246,[26] or possibly by legislation.[27] While there may be unusual situations where the "appearance of impropriety" alone is sufficient to warrant disqualification, we are satisfied that this is not such a case. Nor do we believe, as Judge Newman asserts, that a failure to disqualify the Gordon firm based on the possible appearance of impropriety will contribute to the "public skepticism about lawyers." While sensitive to the integrity of the bar, the public is also rightly concerned about the fairness and efficiency of the judicial process. We believe those concerns would be disserved by an order of disqualification in a case such as this, where no threat of taint exists and where appellants' motion to disqualify opposing counsel has successfully crippled the efforts of a receiver, appointed at the request of a public agency, to obtain redress for alleged serious frauds on the investing public. Thus, rather than heightening public skepticism, we believe that the restrained approach this court had adopted towards attempts to disqualify opposing counsel on ethical grounds avoids unnecessary and unseemly delay and reinforces public confidence in the fairness of the judicial process.

Accordingly, we vacate the panel opinion in this case and affirm the judgment of the district court.

MULLIGAN, Circuit Judge, concurring in part and dissenting in part.

I concur in that part of the majority opinion which holds that no attorney disqualification was required in this case but I respectfully dissent from the majority's overruling *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 496 F.2d 800 (2d Cir. 1974) (en banc).

The position of this court on this subject has been one of tergiversation. In *Harmar Drive-In Theatre, Inc. v. Warner Bros. Pictures, Inc.*, 239 F.2d 555 (2d Cir. 1956), reh. den., 241 F.2d 937 (2d Cir. 1977), cert. denied, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38 (1957) Judge Swan, with the concurrence of Judge Learned Hand (Clark, C. J., dissenting), held that denials of motions to disqualify counsel fall within the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Harmar* was implicitly overruled by *Fleischer v. Phillips*, 264 F.2d 515 (2d Cir. 1959), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) but was resurrected by our unanimous decision en banc in *Silver Chrysler* in 1974. Today we inter *Silver Chrysler* but I refuse to participate in the sepulture.

In addition to our own agonizing over this problem, the conflict of opinion among the circuits[1] attests to the difficulties

---

**26.** The Reporter for the ABA Committee that drafted the Code of Professional Responsibility recently noted that the Code's Disciplinary Rules were drafted for use in disciplinary proceedings and were not intended to be used as rules governing disqualification motions. Sutton, How Vulnerable Is the Code of Professional Responsibility?, 57 N.C.L.Rev. 497, 514–16 (1979). The Code nevertheless will continue to provide guidance for the courts in determining whether a case would be tainted by the participation of an attorney or a firm. See *Fund of Funds*, supra, 567 F.2d at 227 n. 2; *NCK Organization, Ltd. v. Bregman*, 542 F.2d 128, 129 n. 2 (2d Cir. 1976).

**27.** Cf. 18 U.S.C. § 207.

**1.** Interlocutory appeals of denials of disqualification are permitted under *Cohen* in five circuits: the Third Circuit, *see Akerly v. Red Barn System, Inc.*, 551 F.2d 539 (3d Cir. 1977); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (3d Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976); *Greene v. Singer Co.*, 509 F.2d 750 (3d Cir. 1971), cert. denied, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) (adopting a case-by-case approach to appealability); the Fourth Circuit, *see Aetna Casualty & Surety Co. v. United States*, 570 F.2d 1197 (4th Cir.), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (grants of disqualification also appealable); *MacKethan v. Peat, Marwick, Mitchell & Co.*, 557 F.2d 395 (4th Cir.

which are inherent in reaching a solution. The issue is whether or not the denial of a motion to disqualify counsel is appealable within the so-called "collateral order" exception to the final judgment rule first announced in *Cohen*. My disagreement with the majority is based upon several of its premises.

I

The majority has the clear impression that the availability of an immediate appeal has contributed to the proliferation of disqualification motions and the use of such motions for delay and other purely tactical purposes. The only available evidence on this question is the opinions which this court has issued in response to interlocutory appeals under *Silver Chrysler*. It seems there have been eleven such opinions. In six of these we affirmed the court below. I cannot characterize this as a serious problem of calendar congestion. The majority contends that a prior ruling in favor of disqualification will give some assurance that appeals of grants of disqualification raise nonfrivolous issues, but that "there is no similiar assurance that appeals from denials of disqualification motions will raise a substantial question." (maj. op. p. 441) It should be noted, however, that the affirmance rates of the two categories of published opinions—appeals from grants and appeals from denials—are not significantly different.[2]

1977) (per curiam); the Fifth Circuit, *see Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671 (5th Cir. 1977); the Seventh Circuit, *see In re Special February 1977 Grand Jury*, 581 F.2d 1262 (7th Cir. 1978); *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.), cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); and the Tenth Circuit, *see State of New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir. 1976), cert. denied, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1978); *Fullmer v. Harper*, 517 F.2d 20 (10th Cir. 1975).

> The Sixth Circuit has recently held that: "where a District Court has heard a motion to disqualify an opposing party's counsel, has denied said motion on the merits after [sic] evidentiary hearing, and has (as here) entered a finding to the effect that the moving party cannot be injured by the challenged representation,"

it will dismiss appeals from denials of disqualification. *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 295 (6th Cir. 1979) (motion to disqualify based on prior representation of a competitor). See also *General Electric Co. v. Valeron Corp.*, 608 F.2d 265 (6th Cir. 1979), cert. denied, 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980). Although the court in *Melamed* considered itself to be departing from *Silver Chrysler, Melamed v. I.T.T. Continental Baking Co.*, supra, at 295, the rule announced in *Melamed* seems identical to this court's clarification of *Silver Chrysler* in *W. T. Grant & Co. v. Haines*, 531 F.2d 671 (2d Cir. 1976).

In addition to this court, three circuits now do not permit interlocutory appeals of denials of disqualification: the D.C. Circuit, *see Community Broadcasting of Boston, Inc. v. FCC*, 546 F.2d 1022 (D.C. Cir. 1976); the Eighth Circuit, see *In re Multi-Piece Rim Products Liability Litigation*, 612 F.2d 377 (8th Cir. 1980), cert. granted sub nom. *Firestone Tire & Rubber Co. v. Risjord*, —— U.S. ——, 100 S.Ct. 2150, 64 L.Ed.2d —— (1980); and the Ninth Circuit, see *Chugach Elec. Ass'n v. United States District Court for the District of Alaska*, 370 F.2d 441 (9th Cir. 1966), cert. denied, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967) (stating that denials are not appealable but granting petition for mandamus without citing *Cohen*); *Cord v. Smith*, 338 F.2d 516 (9th Cir. 1964), clarified, 370 F.2d 418 (9th Cir. 1966) (stating that denials are not appealable without citing Cohen but granting petition for mandamus).

2. The eleven appeals from denials of disqualification are *In the Matter of Bohack Corp.*, 607 F.2d 258 (2d Cir. 1979) (order denying disqualification reversed); *Armstrong v. McAlpin*, 606 F.2d 28 (2d Cir. 1979) (order denying disqualification reversed); *In re Hartford Textile Corp.*, 588 F.2d 872 (2d Cir. 1978) (per curiam) (order affirmed), cert. denied, 444 U.S. 975, 100 S.Ct. 473, 62 L.Ed.2d 392 (1979); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977) (order reversed); *Allegaert v. Perot*, 565 F.2d 246 (2d Cir. 1977) (order affirmed); *SEC v. Sloan*, 535 F.2d 679 (2d Cir. 1976) (per curiam) (order affirmed), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *W. T. Grant & Co. v. Haines*, 531 F.2d 671 (2d Cir. 1976) (order affirmed); *Lefrak v. Arabian American Oil Co.*, 527 F.2d 1136 (2d Cir. 1976) (order affirmed); *J. P. Foley & Co. v. Vanderbilt*, 523 F.2d 1357 (2d Cir. 1975) (case remanded); *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2d Cir. 1975) (order affirmed); *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974) (order reversed). Counting the reversal in *Armstrong* which this court now vacates, six of eleven appeals from denials of disqualification resulted in affirmance.

There are nine opinions arising from appeals of grants of disqualification. *United States v.*

But more to the point, a proliferation of appeals, if such there be, has no logical bearing on the test set forth in *Cohen*. Appealability under *Cohen* does not depend upon the quantum of appellate business which might be generated by a holding in favor of appealability. This point was addressed recently in *Abney v. United States*, 431 U.S. 651, 662 n. 7, 97 S.Ct. 2034, 2041 n. 7, 52 L.Ed.2d 651 (1977). There a unanimous Court held that pretrial orders rejecting claims of former jeopardy were final decisions within *Cohen* and thus immediately appealable. The Solicitor General had argued that such a holding might encourage dilatory appeals. Mr. Chief Justice Burger rejected this argument, noting that it is "well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims of former jeopardy." *Id.*

Aside from this observation, in appeals from denials of disqualification we have the power to award counsel fees and costs, which provide ample sanctions against those whose intention is to create delay. *See, e. g.*, 28 U.S.C. §§ 1912, 1927; Fed.R.App.P. 38. I conclude that the majority has failed to provide any empirical support for the premise which it believes requires a reexamination of *Silver Chrysler*; that conceptually this premise, even if true, is irrelevant; and that practically, if abuse occurs, there are means to curtail it better tailored to the abuse than the draconian alternative of denying all interlocutory appeals.

*Ostrer*, 597 F.2d 337 (2d Cir. 1979) (order granting disqualification affirmed); *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979) (order reversed); *In re Taylor*, 567 F.2d 1183 (2d Cir. 1977) (order reversed and remanded as premature); *Government of India v. Cook Industries, Inc.*, 569 F.2d 737 (2d Cir. 1978) (order affirmed); *NCK Organization, Ltd. v. Bregman*, 542 F.2d 128 (2d Cir. 1976) (order affirmed); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976) (order affirmed); *International Electronics Corp. v. Flanzer*, 527 F.2d 1288 (2d Cir. 1975) (order reversed); *United States v. Armedo-Sarmiento*, 524 F.2d 591 (2d Cir. 1975) (order reversed); *Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975) (order affirmed). Five of nine appeals of grants of disqualification resulted in affirmance.

## II

*Cohen* established three criteria for determining when an order is a "final decision" under 28 U.S.C. § 1291. The order must (1) involve an important issue entirely collateral to the merits; (2) have been conclusively decided by the court below; and (3) be effectively unreviewable after final judgment. *Id.* at 546–47, 69 S.Ct. at 1225–26.

The majority concedes that rulings on disqualification motions are collateral within the meaning of *Cohen*. Nor is there any doubt that such orders are conclusive. Although the original dispute in this court over this question was framed in terms of finality, *compare Harmar Drive-In Theatre, Inc. v. Warner Bros. Pictures, Inc., supra, with Fleischer v. Phillips*, 264 F.2d 515 (2d Cir. 1959), it seems clear that such denials are no less conclusive than other orders which the Court has found appealable under *Cohen*. *See, e. g., Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (motion for reduction of bail); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (motion to dismiss on double jeopardy grounds). The facts which are relevant to a decision whether to disqualify will generally be fully available at the outset of litigation. There is no particular reason to anticipate a reversal of position by the district court.

The majority finds that denials of disqualification motions do not satisfy two aspects of the *Cohen* criteria. It argues that the harm caused by an erroneous denial of a

Any conclusions drawn from the above facts are obviously subject to several caveats. The sample may be too small to reveal a statistically significant difference. Grants of disqualification in criminal cases, see, e. g., *United States v. Armedo-Sarmiento, supra*, may result in a higher percentage of reversals because Sixth Amendment values are implicated, see *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). That there are equal percentages of affirmances among published opinions does not necessarily imply that there are equal percentages of affirmances without opinions. Nevertheless, considering the information available to us, it is fair to say that the existence of roughly equivalent percentages of affirmances of grants and denials does not support the majority's premise.

disqualification motion is usually not irreparable because this court retains its traditional power to grant a new trial if the district court's ruling is found after final judgment to be incorrect. (maj. op. p. 438) We respectfully disagree.

I do not read *Silver Chrysler* as the majority does, to permit appealability in all cases where there has been a denial of disqualification. We suggested in *Lefrak v. Arabian American Oil Co.,* 527 F.2d 1136, 1139–40 (2d Cir. 1975) and *W. T. Grant v. Haines,* 531 F.2d 671, 678 (2d Cir. 1976) that for an order to be appealable under *Silver Chrysler,* it is necessary that the issue appealed from relate to a taint of the trial. If issues not involving the integrity of the trial are involved, there should be no appeal under *Silver Chrysler. See, e. g., Lefrak v. Arabian American Oil Co., supra* (improper solicitation of a client); · *W. T. Grant & Co. v. Haines, supra* (improper communication with an adverse party).[3] The ethical problems involved in such cases can be handled by a bar association grievance committee or by the courts in separate proceedings. Where there is a conflict of interest, however, and counsel sought to be disqualified is in possession of privileged information which may be utilized against a former client, I cannot agree that an appeal from the final judgment and the granting of a new trial protect the interests of the client, much less the public interest in the integrity of the judicial process. We have supported an order of disqualification, in the words of Chief Judge Kaufman, because "[t]he stature of the profession and the courts, and the esteem in which they are held, are dependent upon the complete absence of even a semblance of improper conduct." *Emle Industries, Inc. v. Patentex,*

*Inc.,* 478 F.2d 562, 575 (2d Cir. 1973). If on appeal from final judgment this court determines that counsel for the successful party had a conflict which contaminated the trial, the interests of the unsuccessful party are probably irremediably injured. The record has been made and it is a public record. The extent to which it has been poisoned by the use of privileged information may not be readily apparent. Retrial with new counsel becomes the empty ritual act which is characteristic of attempts to remedy the effects of erroneously decided *Cohen*-type orders after final judgment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 688–89, 70 S.Ct. 861, 864–65, 94 L.Ed. 1206 (1950). Moreover, the integrity of the judicial process has been sacrificed and that certainly is not redeemed by a second trial with qualified counsel. These are the elements of irreparable harm which are involved. The harm is not simply, as the majority would have it, the need "to bear the time and expense involved in a trial that may possibly be tainted." (maj. op. p. 438)

In urging that orders granting disqualification do involve irreparable harm and therefore are appealable under *Cohen,* the majority suggests that the trial will be delayed until new counsel is obtained, the client will be separated from counsel of his choice and counsel himself will be stigmatized. We are of course dealing with imponderables, but even assuming all of these eventualities, they are less weighty than those which may well afflict the litigant forced to trial where his opponent is represented by an attorney who may have been privy to privileged information which can be now utilized against him.[4]

---

3. This restriction on appealability does not involve this court in any elaborate consideration of the merits in order to determine appealability or in any elaborate factual inquiry such as that necessitated by the "death knell" approach to the appealability of class certification denials which was recently disapproved in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). In many cases it will involve little more than a consideration of which Disciplinary Rule is implicated. It is much more akin to the inquiry we must make

in applying 28 U.S.C. § 1292(a)(1) which facially permits interlocutory appeals from orders refusing injunctions. In *Gardner v. Westinghouse Broadcasting Co.,* 437 U.S. 478, 480, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) the Court construed the section to be limited to those orders involving "serious, perhaps irreparable, consequences."

4. We have, of course, noted our reluctance to separate a client from counsel of his choice and will not where the professional misconduct

### III

The majority also contends that *Silver Chrysler*, in permitting interlocutory appeals from orders denying disqualification, offended the *Cohen* requirement that the issue on appeal be "too important to be denied review." *Cohen v. Beneficial Industrial Loan Corp., supra*, 337 U.S. at 546, 69 S.Ct. at 1226. The majority reads *Cohen* to be directed to those interlocutory appeals "raising potentially decisive legal, as opposed to factual, questions. In contrast, most disqualification motions involve primarily factual, rather than legal determinations [which] do not present 'serious and unsettled question[s].' " (maj. op. p. 439) Assuming this to be a correct analysis of *Cohen*, how then can the majority at the same time argue that orders granting disqualification are appealable under *Cohen*? There is no question that such orders are appealable as *Cohen* exceptions to 28 U.S.C. § 1291. *See Emle Industries, Inc. v. Patentex, Inc., supra*, at 570 n. 5. Precisely the same factual and legal issues are involved whether the district court grants or denies the motion to disqualify. The majority cannot have it both ways. If, as my brothers contend, disqualification motions do not raise any potentially decisive legal issues in unsettled areas of the law then they cannot reasonably contend that orders granting disqualification are appealable under *Cohen*.

Whether *Cohen* does in fact require that the order sought to be appealed involve a serious legal question which has not been settled has not been as clear as a mountain lake in springtime. The statement of the *Cohen* criteria which we have recited above and which has been repeated in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98

S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) and *Abney v. United States*, 431 U.S. 651, 658, 97 S.Ct. 2034, 2039, 52 L.Ed.2d 651 (1977) simply provides that the issue be "important" or "too important to be denied review." The Court in *Cohen* did state that the issue in that case presented a serious and unsettled question. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. at 547, 69 S.Ct. at 1226. That this created a requirement beyond the normally stated criteria apparently was first suggested by Judge Friendly in *Donlon Industries, Inc. v. Forte*, 402 F.2d 935, 937 (2d Cir. 1968) and again in *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l., Inc.*, 455 F.2d 770, 773 (2d Cir. 1972). It was applied also in *International Business Machines Corp. v. United States*, 480 F.2d 293, 298 (2d Cir. 1973) (en banc) (Mulligan, J.), cert. denied, 416 U.S. 980, 94 S.Ct. 2413, 40 L.Ed.2d 777 (1974).

This so-called "public importance" gloss on *Cohen*, however, has not been applied consistently in this circuit. Thus it has been noted that "many collateral order cases, including recent decisions from the Second Circuit, allow appeals that will not settle general questions, and that threaten to invite a large number of similar appeals. The recent ruling [citing *Silver Chrysler*] that orders *granting* or *denying* motions to disqualify counsel are appealable provides ample illustration" (emphasis supplied). Wright, Miller & Cooper, *Federal Practice and Procedure* § 3911 at 496. *See also* Note, *The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts*, 45 U.Chi.L.Rev. 450, 461 (1978).

Having found no post-*Cohen* Supreme Court authority which has turned upon this

---

charged does not prejudice the opposing party or taint the litigation. *W. T. Grant & Co. v. Haines*, 531 F.2d 671 (2d Cir. 1976). However, where the conflict of interests exposes a former client to prejudice and this taints the trial, we have not hesitated to order disqualification. *In the Matter of Bohack*, 607 F.2d 258 (2d Cir. 1979). *See also Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975). In cases involving bankrupts or debtors-in-possession it has become routine to appoint prior counsel as coun-

sel in the proceedings in bankruptcy. This creates a clear danger of conflict of interest. In *Bohack* we depended upon *Silver Chrysler* for appellate jurisdiction. Today's opinion is particularly regrettable in that it shields these cases from immediate review. The affront to the integrity of the judicial process is especially serious since appointment of counsel has been routinely approved by the bankruptcy court. See *In re Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir. 1979).

"public importance" factor or indeed has even mentioned it, I am now compelled to conclude that it is not a *Cohen* requirement. In *Abney v. United States, supra,* the Court held that there was a right to appeal from an order denying a motion to dismiss an indictment on double jeopardy grounds under *Cohen.* Whether or not double jeopardy applies in a particular case, however, will depend upon its facts. *Id.* 431 U.S. at 664, 97 S.Ct. at 2042. It is now apparent that such orders are all within *Cohen* despite the fact that they will normally involve no unsettled issues of law on appeal but rather will primarily require a factual determination. The issue of whether a litigant should be required to go to trial where his opponent is represented by counsel who is privy to confidential and privileged information presents a serious issue too important to be denied review and is thus within *Cohen.* So long as the unethical conduct exposes the trial to taint there is a public as well as a private interest that this collateral matter be given prompt appellate review. Appeal from the denial of such disqualification presents an even stronger case for *Cohen* treatment than an order granting disqualification, which precludes any possibility of a tainted trial.

The suggestion that § 1292(b) certification or mandamus will adequately protect the party who has lost the motion to disqualify is not persuasive. If these were sufficient remedies then they would equally bar resort to *Cohen* where disqualification is ordered. Appeal under § 1292(b) requires certification by the district court that an order involves a controlling question of law. But the majority argues that this seldom occurs because cases such as the one which we have today decided on the merits involve primarily the application of facts to established law. *See also Trone v. Smith,* 553 F.2d 1207 (9th Cir. 1977) (§ 1292(b) is not a proper avenue for review of denials of disqualification). Mandamus provides even less assurance of protection. *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967) makes it plain that error, even gross error, as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ.

For these reasons we should adhere to *Silver Chrysler.* In any event, if the majority is correct that the "public importance" factor is inherent in *Cohen,* then we must also refuse to hear appeals from motions granting disqualification. We conclude that it is not an inherent factor and that both the grant and the denial of disqualification motions are appealable under *Cohen.*

MESKILL, Circuit Judge (concurring in part and dissenting in part):

I concur in that part of the majority opinion which holds that no attorney disqualification was required, but dissent from the overruling of *Silver Chrysler* and concur in Judge Mulligan's separate opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

The refusal of a district court to disqualify counsel leaves neither court nor opponent without remedy. The court may order disqualification at any later time if subsequent events make it appropriate. Disbarment, *see United States v. Costen,* 38 F. 24 (C.C.D.Colo.1889), reversal, *see United States v. Bishop,* 90 F.2d 65 (6th Cir. 1937), injunctive protection, *see United States v. Mahaney,* 27 F.Supp. 463 (N.D.Cal.1939), and denial of compensation, *see Gesellschaft Fur Drahtlose Telegraphie M. B. H. v. Brown,* 78 F.2d 410 (D.C.Cir.), *cert. denied,* 296 U.S. 618, 56 S.Ct. 139, 80 L.Ed. 439 (1935), are also available remedies. I agree, therefore, that the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) does not give this Court jurisdiction to hear appeals of this nature. Because the provisions of the Code of Professional Responsibility are presently in a state of flux,* and we shed little permanent light

---

\* A Discussion Draft of the Model Rules of Professional Conduct is presently being circulated by the American Bar Association and a final version of the Rules will be submitted to

by our discussion of the merits, I would simply dismiss the instant appeal for lack of jurisdiction.

NEWMAN, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's conclusions that orders denying disqualification are not reviewable on an interlocutory appeal [1] and that this ruling on appealability should be given only prospective effect; on the merits, however, I respectfully dissent.

The majority's opinion does not deal with the ultimate issue on the merits: whether a law firm's representation violates Disciplinary Rule 5–105(D) when one of its partners is disqualified under Disciplinary Rule 9–101(B). Instead the majority concludes that, whether or not the firm's representation violates the Code of Professional Responsibility, a trial court should not disqualify the firm unless (a) the firm's representation would taint the trial or (b) the case is one of those "unusual situations where the 'appearance of impropriety' alone is sufficient to warrant disqualification." 625 F.2d at 446. In this case the majority finds neither a threat of taint nor a suffi-

cient basis to disqualify to avoid the appearance of impropriety. I disagree with both this standard for disqualification and its application to this case.

As expressed by the majority, this standard makes trial taint the primary and nearly exclusive basis for disqualification, relegating "appearance of impropriety" to a remote and uncertain role at best.[2] In my view, the judiciary should be much more willing to use the sanction of disqualification to make sure that the canons of ethics are not violated in the courtroom. I can agree that not every violation of the Code should result in disqualification. Especially when a violation occurs after litigation has begun, it will sometimes be fairer to the interests of both the public and the client to permit the trial to continue to conclusion and then use the grievance procedures for appropriate discipline. But when the alleged violation concerns the propriety of undertaking representation at the outset, a court should inquire into whether a lawyer and his firm are violating the Code by appearing in the litigation, whether or not such representation will taint the trial.[3]

---

the House of Delegates at its February 1981 meeting.

1. My conclusion that orders denying disqualification are not within the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), rests entirely on the failure to meet Cohen's requirement that review after final judgment will be ineffective. I do not agree with the suggestion in the majority opinion that Cohen's requirement of an issue "too important" to be deferred encompasses only decisive legal questions and not the application of settled legal rules to particular facts. As Judge Mulligan points out, supra at 450, this limitation would preclude interlocutory review of most orders granting disqualification. "Importance" relates to the consequences to the parties (or their lawyer), not to whether the issue has public significance.

2. Limiting disqualification to instances of trial taint may have been somewhat more justified prior to today's decision, when denials of disqualification were subject to interlocutory appeal. It may be that fear of dilatory interlocutory appeals played some part in the emergence of the "trial taint" standard, limiting the grounds for court-enforced disqualification. It

is somewhat ironic that a "trial taint" standard should now become virtually absolute at the very time that interlocutory appeals from denial of disqualification are being prohibited.

3. It is clear that trial courts could appropriately enforce, at the outset of litigation, disqualification rules that are not concerned only with trial taint. However, such an approach would pose different issues for an appellate court considering a trial court's denial of disqualification on appeal from a final judgment after trial. At that point reversal of the judgment might sometimes be an excessive penalty for violation of the canons, too costly to both the litigants and the public. Perhaps the penalty for representation in violation of the canons, where trial taint has not occurred should be simply forfeiture of attorney's fees. Even if reversal of a judgment were inappropriate, appellate rulings on whether the representation was proper would increase observance of the canons and provide useful guidance for trial courts. Whatever sanctions might be appropriate for an appellate court to impose when, after judgment, denial of disqualification is held to have been erroneous, the disqualification sanction, not limited to instances of trial taint, should be available for use by trial courts when the canons are violated at the outset of litigation.

The appropriateness of such inquiry is especially high when the Code provision at issue regulates the ethical conduct of government attorneys. DR 9–101(B) is not concerned solely with the trial taint that may occur if an attorney handles a matter for which he previously had substantial responsibility as a government lawyer. It also seeks to avoid "the manifest possibility that . . . [a former Government lawyer's] action as a public legal officer might be influenced (or open to the charge that it had been influenced) by the hope of later being employed privately to uphold or upset what he had done." *General Motors Corp. v. City of New York*, 501 F.2d 639, 648–49 (2d Cir. 1974). Courts traditionally have been most sensitive to the enforcement of standards designed to limit governmental power. They should be at least as sensitive to the enforcement of standards specifically designed to protect against the misuse of such power. The purposes of DR 9–101(B) cannot be fully achieved unless there is no possibility that the government attorney can be (or seem to be) influenced by the prospect of later private employment. To remove that possibility requires disqualification not only of the attorney, when handling a related matter, but also of his firm.[4]

Even under the majority's limited standard for disqualification, Altman's firm should be disqualified in this case. First, if threat of taint is accepted as the primary ground for disqualification, such threat is present here. In *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979), it was recognized that a former Government attorney's possession of confidential information unavailable to the other side would risk trial taint sufficiently to warrant his disqualification. *Id.* at 1247–48 n. 1 (Mans-

field, J., concurring). That risk is not eliminated by screening the lawyer from his firm. In *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 229 n. 10 (2d Cir. 1977), a Chinese Wall within a law firm was thought to be inadequate protection against the risk that information from one of the firm's clients, with interests adverse to another of the firm's clients, would be transmitted from one partner to another. If in this litigation it should become crucial to the outcome for the lawyers representing the plaintiff to know some confidential information learned by Altman while in government employ, I do not see why a Chinese Wall should be thought more impervious to information that originated from a government investigation than to information learned from a client with adverse interests.[5]

Second, this case should be deemed to meet the majority's exception to the taint standard for an unusual situation where the appearance of impropriety warrants disqualification. In addition to the need to disqualify the firm to avoid all risk that a government attorney might misuse his authority in hope of later private gain, appearance of impropriety exists here because of the further risk that the screening procedure will not be effective. It may well be that no matter how this litigation develops, Altman will in fact not disclose to his partners anything he learned while exercising substantial government responsibilities for related matters. But the public will not believe it. Of course, the rules of law, including the rules of disqualification, cannot cater to all the often unfounded apprehensions of the public. But we do not deal here with just a generalized public skepticism about lawyers. The policymaking

---

4. In this case there is no reason to doubt that Altman acted fairly and uprightly as a government attorney. But the canons of ethics, it has been properly pointed out, are designed as guidance for the honorable attorney, not simply as a proscription against misconduct. *General Motors, supra*, 501 F.2d at 649.

5. The majority opinion suggests that the absence of risk of taint is a factual finding of the District Court, not shown to be clearly erroneous. I would agree that whether a Chinese

Wall within a law firm has been breached would be an issue of fact. However, whether such a device is prospectively a sufficient safeguard to justify a representation forbidden by the Code is an issue of law. That issue was not considered in the panel opinion because disqualification of the firm was thought to be required by the Code and the principle of the *General Motors* case, regardless of whether a Chinese Wall could adequately prevent taint.

454

body of the legal profession's largest and most influential membership organization has adopted a Code of Professional Responsibility that bars Altman from representing the plaintiff in this case (DR 9–101(B)) and bars his partners as well (DR 5–101(D)). The public understandably will see an appearance of impropriety when, despite the clarity of these prohibitions, Altman's law firm is allowed to continue its representation because of the assurance that Altman and his partners will not discuss this case. The public will also justifiably perceive impropriety when, despite the prohibition of the canons, a government lawyer handles a matter and the law firm he subsequently joins is not disqualified from representation in a substantially related matter.[6] To allow such representation leaves the government lawyer open to the charge that his action as a public legal officer might have been influenced by the hope of later being employed to uphold what he had done, as this Court warned in *General Motors, supra.* The appearance of impropriety should be avoided by disqualification of Altman's firm.

Whether the Code of Professional Responsibility should maintain its present rule requiring the disqualification of the former government attorney's firm is a matter on which reasonable minds may differ. Serious concerns have been expressed that the Code, as now written, may unduly restrict private employment opportunities of government lawyers and thereby impair the government's ability to attract competent attorneys. That issue is now receiving attention by those charged with responsibility for reviewing and perhaps revising the content of the Code. But until some concrete evidence of adverse consequences supplies grounds for changing the Code's present provisions, I would apply them as written, find Altman's firm to be in violation of the Code by its representation in this case, and

grant the motion to disqualify to maintain the important ethical principles on which the Code is based.

---

**6.** The majority opinion suggests that countervailing considerations are to be found in the public expectation of efficiency in the judicial process, and that further delay resulting from disqualification of the Gordon firm should not be tolerated. I do not think efficiency, even in the pursuit of alleged wrongdoing, justifies a failure to enforce a rule of ethics that is specifically designed to remove the temptation and opportunity for misuse of governmental authority. Moreover, I cannot agree that the delay to date and subsequently, if disqualification were ordered, is chargeable to appellants. The onus quite properly rests with the Gordon firm, which undertook a representation in the face of the Code's clear prohibition.