**Norman W. BODILY, Plaintiff,**

v.

**INTERMOUNTAIN HEALTH CARE CORPORATION, dba McKay-Dee Hospital Center, H. Gary Pehrson and Sheldon D. Ward, M.D., Defendants.**

**Civ. No. C85–373G.**

United States District Court, D. Utah, C.D.

Nov. 24, 1986.

the scheduling/settlement conference to be set by the court.

Glenn C. Hanni, Salt Lake City, Utah, Howard, Lewis & Petersen, Provo, Utah, for plaintiff.

Dan S. Bushnell and Charles W. Dahlquist, II, Salt Lake City, Utah, for defendants.

J. THOMAS GREENE, District Judge.

This matter came on for hearing on September 29, 1986, on defendant Intermountain Health Care Corporation's Motion to Disqualify. Defendant Intermountain Health Care was represented by Dan S. Bushnell and Charles W. Dahlquist II, and the law firm of Howard, Lewis & Peterson was represented by Glenn C. Hanni. Legal memoranda were submitted on behalf of all parties, testimony of witnesses was heard and exhibits were received into evidence. Counsel argued the Motion extensively after which the matter was taken under advisement. The court now being fully advised, sets forth its Memorandum Decision and Order.

## FACTUAL BACKGROUND

The law firm of Howard, Lewis & Peterson (the "Howard firm"), which is located in Provo, Utah, has a well-established general litigation practice with particular emphasis upon medical malpractice and personal injury claims. On April 1, 1985, the plaintiff, Norman W. Bodily, by and through his attorneys, the Howard firm, filed a medical malpractice action in federal district court against Intermountain Health Care Corporation ("IHC"). At the time the dispute herein arose, the Howard firm had six other lawsuits pending in various stages of discovery against IHC in various courts within this state.

On July 11, 1985, Mr. Peter C. Rosenbloom of the Los Angeles, California law firm of Findlay, Kumble, Wagner, Hein, Underberg, Manley & Casey contacted Mr. Richard B. Johnson, a partner with the Howard firm, by telephone. Having selected the Howard firm from among listings in the Martindale Hubbell referral service, Mr. Rosenbloom briefly introduced himself and indicated that his firm had been retained by IHC to represent that entity in connection with a wrongful discharge action brought by Veta S. Wilson. Wilson, a former employee of the Utah Valley Regional Medical Center, a Provo, Utah facility owned and operated by IHC, had filed an action against IHC on June 14, 1985, in Utah's Fourth Judicial District Court. In his conversation with Johnson, Rosenbloom indicated that his law firm needed a local firm to move for the admission of certain firm members to practice in the *Wilson* matter and also to conform documents to the local rules of practice. Johnson testified that during this initial telephone conversation he specifically informed Rosenbloom that the Howard firm had a number of malpractice cases pending against IHC, including the *Bodily* litigation. Johnson said he explained that the Howard firm's proposed representation of IHC presented a serious conflict of interest problem but that Rosenbloom said he did not see a conflict, nor have any problem with the Howard firm's pending lawsuits against IHC in unrelated litigation. Nevertheless, according to Johnson, Rosenbloom stated that if there were any problems in discussing the matter with his superiors and the client, he would let Johnson know.[1] Other-

---

1. A disputed telephone log was produced for the first time by Mr. Johnson during the course of these proceedings. A notation thereupon relative to the crucial initial conversation between

wise, Rosenbloom said that the file would be sent the next day with instructions for Johnson to appear as local counsel in the case in order to accomplish the purposes previously outlined.[2]

The following day, Johnson received a confirmation letter from Rosenbloom by express mail dated July 11, 1985, requesting that Johnson file a motion for the admission, *pro hac vice* of Mr. Gary R. Overstreet, Mr. Michael W. Monk and Mr. Peter C. Rosenbloom for purposes of the *Wilson* litigation. The matter was set up on the billing and accounting records of the Howard firm under the name of Rosenbloom since Mr. Johnson considered that he was simply performing a minor professional courtesy as local counsel for out of state attorneys. Johnson did not discuss the new representation with other members of the Howard firm, and no one otherwise discovered the Howard firm's conflicting representation of IHC.

On July 17, 1985, Johnson filed the appropriate motion, and an Order admitting the California attorneys was signed by Honorable George E. Ballif on August 1, 1985. Later in August, Johnson reviewed and edited a draft of motion to dismiss and memorandum in connection with the *Wilson* matter, and returned it to Rosenbloom who made additional corrections and returned it to Johnson. The motion and memorandum were filed with the Utah court on August 19, 1985. Subsequently, Johnson prepared a notice of deposition, which was to be held on September 27, 1985, although Johnson was never contemplated as the attorney who would take the scheduled deposition. On October 17, 1985, Rosenbloom sent Johnson a letter confirming a conversation several days earlier and enclosed a draft of their proposed reply brief in the *Wilson* litigation. Johnson also edited this brief as to form and filed it with

the court. On November 8, 1985, the state district court ruled upon an ex parte motion and order for leave to file an oversized memorandum and order, which motion had been prepared by Johnson. Mr. Johnson did no further work on the *Wilson* matter after this time and he submitted a bill to the California counsel for legal services and costs in the name of Rosenbloom for the amount of $195.82.

According to Johnson's testimony, supported by other evidence, no written documents of any kind were requested or received by Johnson from IHC. Johnson at no time discussed the *Wilson* case with IHC's counsel, management or other personnel. Johnson testified that the Howard firm did not receive from any source, nor was it privy to, any confidential or secret information of IHC. Although Johnson did not solicit or receive information of any kind in connection with the *Wilson* litigation which may have been used or construed as against the interests of IHC in other litigation, as counsel for IHC in the *Wilson* case he had access to such information and materials.

Johnson testified that it was his understanding from the representations of IHC's designated California counsel that IHC had knowledge of the need for local counsel and was consenting to the Howard firm's representation in this matter. Nevertheless, Johnson did not memoralize his initial conversation with Rosenbloom concerning the disputed disclosure of the conflict by way of a follow-up letter to Rosenbloom or by other written communication. Johnson did not contact or inform IHC or its Salt Lake City counsel of the Howard firm's potentially conflicting representation. Further, Johnson did not contact any of the other clients of the Howard firm, including Bodily, which had pending lawsuits against

---

Johnson and Rosenbloom had the following entry: "Gary Overstreet—meeting with client—IHC conflict explained 1) Pro Hac 2) file motion to dismiss will send if client approves."

**2.** Rosenbloom testified that during this conversation Johnson made no mention of the How-

ard firm's then existing adverse representation of Bodily, or of the Howard firm's various prior and pending lawsuits against IHC. He further testified that nothing was said about a possible conflict of interest.

IHC for the purpose of disclosing the potential conflict and obtaining their consent to the proposed dual representation. In November, IHC's inhouse and Salt Lake City counsel discovered that the Howard firm had been engaged by the California firm to represent IHC. Johnson was immediately contacted by telephone and told to perform no further service and that his employment in the matter was terminated. It is undisputed that in this telephone conversation Johnson asserted that the California firm had "cleared" the representation insofar as conflict of interest matters are concerned.

The movant in this action cannot be said to have brought this motion for purely tactical reasons, but there was evidence of a poor professional working relationship between counsel in the *Bodily* litigation. This "bad blood" between the attorneys may have been a partial motivation for the instant motion.[3] Mr. Johnson withdrew as counsel in the *Wilson* matter on January 16, 1986. On March 6, 1986, IHC filed the instant Motion to Disqualify in the case before this court, alleging violations of

Utah's Code of Professional Responsibility by the Howard firm.

## LEGAL ANALYSIS

### I. THE LAW GOVERNING LAWYERS

The law governing lawyers consists of principles of substantive and procedural law as well as ethical rules. Certain requirements of lawyer conduct, such as mandates of competence,[4] may emanate both from substantive law and ethical rules. Other requirements of lawyer conduct, such as certification of allegations in pleadings, may emanate from rules of court and rules of procedure as well as ethical rules. In some cases, courts have established rules of law from ethical rules.[5] In the conduct of litigation, courts often apply rules of law and/or rules of ethics to preserve the integrity of the proceeding. There is no practical distinction in cases arising in many jurisdictions, including the United States District Court for the District of Utah, where the court in question has incorporated as a rule of court the

---

3. Charges of "unprofessionalism and a violation of the Canons of Ethics" were not only denied but responded to with charges of "generally bad" prior experience, resentment and an assertion of "pomposity."

4. Certain ethical mandates, such as lawyer competence, may *reflect* substantive law requirements such as the standard of care required of lawyers, but rules of ethics are said not to *create* the substantive law requirement. The *Model Rules of Professional Conduct*, adopted by the ABA in 1983 and presently pending before the Supreme Court of Utah with certain proposed modifications to replace the existing *Code of Professional Conduct*, set forth the scope and purport of ethical rules as the basis for disciplinary action but not necessarily civil liability:

 Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.
 Model Rules, p. 5.

5. For instance, the canon of ethics which makes it improper for an attorney to communicate directly with a person on the other side who is

represented by counsel has been utilized to create a rule of law which would exclude otherwise voluntary statements obtained from an accused. In *United States v. Thomas*, 474 F.2d 110 (10th Cir.1973), the court was confronted with violation of an ethical canon in which the prosecuting attorney had obtained a statement from a criminal defendant without informing his attorney or giving him a reasonable opportunity to be present at the interview. The court observed that no constitutional principle was here involved, but said:

 What we do hold, however, is that once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something which the defendant alone can waive.
 *Id.* at 112.

Code of Professional Conduct or other ethical rules.[6]

Violation of the law and rules governing the conduct of lawyers in the context of litigation requires, among other things, an analysis of the nature of the violation and its impact upon the trial proceedings. The imposition of appropriate sanctions is properly left to the discretion of the trial court.

## II. VIOLATIONS OF THE CANONS OF ETHICS

■ It is alleged that the Howard firm violated various Canons of the Code of Professional Responsibility. The Howard firm raises three basic defenses: (1) that under the facts of this case there is presented a situation of prior representation which would bring into play the doctrine of "substantial relationship";[7] (2) that adequate consent was obtained from IHC through its designated agents or representatives so as to permit simultaneous representation; and (3) that even assuming the existence of a conflict of interest, no prejudice or hardship is presented in this matter which would warrant the sanction of disqualification.

IHC alleges in its Motion to Disqualify that the Howard firm committed violations of Canons 4, 5 and 9.[8] The court will address each claim separately:

### A. CANON 4

Canon 4 relates to situations in which an attorney represents an interest adverse to a client he has previously represented. In such situations, the applicable ethical rule provides that a lawyer shall not knowingly "use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after a full disclosure."[9] This ethical canon imposes a presumption of disclosure of the confidences and secrets of a client and hence violation of the Canon where the matters at issue are comparatively similar and related. In determining that matter, courts have generally applied a "substantial relationship" test. Under that standard, an examination is undertaken of the

---

**6.** Rule 1(g) of the Civil Rules of Practice of the United States District Court for the District of Utah states:

> The standards of conduct of the members of the bar of this court ... in a particular case shall be those prescribed by the Utah Code of Professional Responsibility and amendments thereto and revisions thereof and by the Code of Professional Responsibility approved by the Judicial Conference of the United States.

The Tenth Circuit Court of Appeals, in *E.E.O.C. v. Orson H. Gygi Co.*, 749 F.2d 620, 621 n. 1 (10th Cir.1984), recognized that the above quoted rule of practice incorporates both the state and national codes of professional responsibility and makes both binding upon counsel before this court. *See also City Consumer Services, Inc. v. Horne*, 571 F.Supp. 965, 969 (D.Utah 1983) ("Utah's Revised Code of Professional Responsibility, adopted by this court in Rule 1(g) of the Local Rules of Practice, [is] binding on all members of the federal bar."); *In re Roberts*, 46 B.R. 815 (D.Utah 1985). Of course, the Utah Supreme Court's construction of Utah's version of the Code is relevant and persuasive.

**7.** Counsel for the Howard firm argued that since Johnson withdrew as counsel in the *Wilson* case in January, by the time the Motion to Disqualify was filed in March its only representation was in the *Bodily* case, and hence Wilson was a *former* client. It is clear, however, that the operative facts occurred when the Howard firm was representing Bodily against IHC and IHC against Wilson simultaneously. The court regards this matter as a case of simultaneous, not prior, representation. Counsel for the Howard firm cites *Beck v. Board of Regents*, 568 F.Supp. 1107 (D.Kan.1983) in support of its argument that *Wilson* should be regarded as a *former* client since that is how it was regarded in a somewhat similar situation in *Beck*, even though there had been simultaneous representation prior to the hearing on the motion for disqualification in that case. One major distinction as between that case and this case, however, is that in *Beck* the court found no violation of the Code of Professional Responsibility because of the simultaneous representation of "possibly or potentially adverse clients." The focus of the analysis in *Beck* was successive representation under Canon 4, but the court found no violation of Canon 5 "under the facts of this case." We have the reverse situation here.

**8.** While violations of other Canons of Ethics were also asserted, including Canons 1 and 2, no evidence or substantial argument was urged at the hearing regarding those Canons. It is apparent that claimed violations of Canons 4, 5 and 9 are relied upon fundamentally as the basis for disqualification.

**9.** DR 4–101(B)(3).

nature, relationship, similarities and other relevant aspects of an attorney's prior and subsequent representation. Both the Tenth Circuit[10] and the Utah Supreme Court[11] have recognized the substantial relationship test under Canon 4 as applicable to cases of *subsequent* adverse representation of a former client.

This court considers the claimed applicability of Canon 4 to the situation presented at bar to be misplaced in that the instant case does not present the situation of "subsequent representation of a former client;" rather, this case involves "simultaneous representation of two existing clients." Likewise, the defense that no "substantial relationship" exists between the *Wilson* wrongful discharge suit and the *Bodily* malpractice action is similarly misplaced. In addressing a situation involving adverse representation of existing clients, the Tenth Circuit Court, noted:

> The propriety of [an attorney's] conduct is "measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients."

*E.E.O.C.*, 749 F.2d at 622 (*quoting Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976) ("The 'substantial relationship' test is ... customarily applied in determining whether a lawyer may accept employment against a *former client* ") (emphasis added).

This court considers that the conduct of the Howard firm should be measured not so much in terms of similarities or dissimilarities between the *Wilson* and *Bodily* cases, but by the Howard firm's professional duty of undivided loyalty to its clients. Accordingly, the court will focus its attention upon alleged violation of Canon 5 rather than the substantial relationship test of Canon 4.[12]

### B. CANON 5

#### 1. General Rule

Canon 5 and the disciplinary rules promulgated thereunder require an attorney to exercise independent professional judgment on behalf of his client and to

> decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment. . . .

DR 5–105(A). Where an attorney represents two adverse clients simultaneously, as the Howard firm has admittedly done in this case, Canon 5 is clearly applicable and there is a per se violation of the Canon, absent the application of exceptions provided for in the Canon. Further, it becomes the burden of proof of the attorney who

---

**10.** In *Smith v. Whatcott,* 757 F.2d 1098, 1100 (10th Cir.1985), (emphasis added) the Tenth Circuit observed:

> The merits of this disqualification motion depend on whether a substantial relationship exists between the pending suit and the matter in which the challenged attorney *previously represented the client.* "Substantiality" is present if the factual contexts of the two representations are similar or related."
>
> \* \* \* \* \* \*
>
> Once a substantial relationship has been found, a presumption arises that a client has indeed revealed facts to the attorney that require his disqualification. The majority of circuits that have considered the issue have held this presumption to be irrebuttable. We agree. The presumption is intended to protect client confidentiality as well as to avoid any appearance of impropriety.

*See also In re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1346 (5th Cir.1981).

**11.** The Utah Supreme Court, in *Margulies v. Upchurch,* 696 P.2d 1195, 1202 (Utah 1985) (emphasis added) said:

> Canon 4's prohibitions against disclosure of client confidences and secrets have generally been interpreted to forbid an attorney from representing a client against a *former* client in a matter *substantially related* to the *former* client's representation.

**12.** If the substantial relationship analysis of Canon 4 were applicable in this case, it would appear that the labor disputes presented in the wrongful discharge case of *Wilson* would not be substantially related to the medical malpractice litigation in this action. However, it is clear that the Canon 4 test is not applicable here because at the time the Howard firm undertook representation of IHC against *Wilson* the firm already represented *Bodily* against IHC.

undertakes to represent adverse clients simultaneously to establish by a preponderance of the evidence that there was no violation.[13]

### 2. Exception

DR 5–105(C) makes clear that concurrent representation of two adverse clients is permissible only under certain narrowly prescribed circumstances:

[A] lawyer may represent multiple clients *if it is obvious* that he can adequately represent the interest of each *and if each consents* to the representation *after full disclosure* of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each. (Emphasis added.)

#### a. *Obviousness*

 The first requirement under DR 5–105(C) is that it be "obvious" to an attorney, in his independent professional judgment, that he would be able to represent both clients adequately. While the Code does not define the word "obvious," an objective standard should be applied, as noted in *City Consumer*, 571 F.Supp. at 971 (*quoting Unified Sewerage Agency*, 646 F.2d 1339, 1348 n. 12 (9th Cir.1981)):

"[W]ithout belaboring the point, we think 'obvious' must refer to an objective standard under which the ability of the attorney adequately to represent each client is free from substantial doubt." I am persuaded that the applicable objective standard, in this case, for defining "obvious" is whether the lawyer possesses substantial doubt that he can adequately represent the interest of each client.

 Regarding the issue of obviousness, Johnson admitted that he immediately detected an obvious conflict of interest in taking on representation of IHC in the

Wilson litigation while suing IHC in *Bodily* and other malpractice actions. According to his testimony, Johnson told Rosenbloom at the time of their initial telephone conversation, and he so testified as to his present perception at the hearing, that without the consent of IHC there could be no representation by the Howard firm of IHC in the *Wilson* litigation. The alleged failure of California counsel to recognize or be concerned about the conflict was and is irrelevant. The point is that the conflict should have been obvious to anyone in the Howard firm, and in fact the conflict was obvious to Mr. Johnson, absent informed client consent. Accordingly, the court focuses on the matter of consent.

#### b. *Informed Consent*

The second requirement of DR 5–105(C) is that the attorney obtain "consent" to the dual representation after "full disclosure" of the possible effects of such representation. The Supreme Court of Utah has ruled, and we agree, that:

For client consent to be adequate in a conflict of interest situation, the attorney must not only inform both parties that he is undertaking to represent them, but must also explain the nature and implications of the conflict in enough detail so that the parties can understand why independent counsel may be desirable.

*Margulies*, 696 P.2d at 1203–04; *see also City Consumer*, 571 F.Supp. at 971 (*informed* consent required).

Counsel for the Howard firm argued that Johnson reasonably could imply that he had obtained the requisite "consent" because Johnson, in good faith, "fully disclosed" the Howard firm's prior existing relationship with IHC to Rosenbloom, the legal representative and agent of IHC, and there was never any suggestion of a problem or conflict.[14] There is no dispute that

---

**13.** It is well-established that the burden of proving compliance with the Code of Professional Responsibility is upon the party undertaking adverse representation of two clients. *City Consumer*, 571 F.Supp. at 970; *Margulies*, 696 P.2d at 1203.

**14.** Johnson testified that he believed and expected that Rosenbloom would advise the client and discuss the matter fully with his superiors as a precondition to mailing the file or requesting any work to be commenced by Johnson. It is urged on behalf of the Howard firm that the nature of its involvement was of very limited

Johnson at no time personally contacted any of IHC's personnel, management or local counsel about a possible conflict. Further, no attorney from the Howard firm spoke with Mr. Bodily or any of the other plaintiffs in the Howard firm's other pending litigation against IHC about the potential conflict of interest before the *Wilson* case was taken on. No memorandum or letter was drafted by Johnson to Rosenbloom confirming the legal representation arrangement and clarifying the delicate issue of IHC's consent to the Howard firm's proposed dual representation. According to his own testimony, Johnson solely relied upon representations of an out-of-state attorney, whom he had never met nor dealt with before.

■ Even under the most favorable light of the facts as related by Mr. Johnson, he failed to obtain the requisite "consent after full disclosure" as mandated by Canon 5. Mr. Johnson's conduct constituted blind faith reliance upon another and was well below the minimum standards prescribed by the applicable Canon of ethics. Even absent Johnson's knowledge and experience in this sensitive area of the law,[15] his efforts and conduct in obtaining the requisite consent were hardly adequate. Under ethical standards applicable to all attorneys, there was neither full nor reasonable disclosure in this case as to either of the clients involved. While reliance on a fellow attorney's representations may often result in the complete disclosure desired and in the receipt of necessary client consent, an attorney so relying does so at his own peril. Here Mr. Johnson's reliance on Rosenbloom was misplaced and unreasonable under the circumstances. It is not contested that Johnson's conduct is imputable to the Howard firm.

This court finds that the Howard firm failed to prove by a preponderance of the evidence that there was no violation of the ethical standards imposed by Canon 5 of the Code of Professional Responsibility. Regardless of the question of burden of proof, however, and even under the version of facts most favorable to the Howard firm, it is manifest that Canon 5 of the Code was violated.

## C. CANON 9

■ Canon 9 of the Code of Professional Responsibility provides that "A lawyer should avoid even the appearance of professional impropriety." This Canon appears to be so all inclusive and indefinite as to constitute a non-standard, but in certain cases courts have found violations of this Canon.[16] This standard is difficult to apply

---

scope and that the so-called "rowing oar" was to be manned almost entirely by California counsel. The following factors were urged as bearing upon Johnson's stated belief that the required consent had been obtained or that he didn't need to pursue the matter: the limited scope of Johnson's intended representation; Johnson's involvement in procedural as opposed to substantive aspects of the litigation; the California firm's direct employment of the local counsel; Johnson's services and transmission of billing reports directly to the designated California counsel; Johnson's reliance upon California counsel's alleged representations concerning disclosure to and consent of the client; the motives of the California and local counsel with regard to their respective involvement; and the lack of actual disclosures made to Johnson.

15. Johnson is an experienced litigator, with particular experience with the Code of Ethics, having vigorously moved for disqualifications prior to this action on several occasions. It would have been or should have been obvious to any attorney that suing an entity in far reaching litigation might and probably would be inconsistent with representing that entity even as to substantially different matters. The necessity of obtaining informed consent from *both* clients likewise should have been obvious to any practicing attorney. *A fortiori* as to Mr. Johnson.

16. The Supreme Court of Utah in *Margulies,* stated:

The basis of this tenet is that society's perception of the integrity of our legal system may be as important as the reality, since it is the perception that engenders public confidence that justice will be dispensed. Litigants are highly unlikely to be able to maintain this confidence if their attorney in one matter is allowed simultaneously to sue them in another.

696 P.2d at 1204. The court pointed out that two important policy considerations must always be balanced carefully by any court ruling on a Motion to disqualify in this situation: the undesirability of separating litigants from the counsel of their choice and the public's perception and the public's percep-

because it requires the court to speculate as to who the observers of relevant appearances are, and it is vague.[17] One court determined that the standard is "too slender a reed on which to rest a disqualification order, except in the rarest of cases."[18] Another court rejected it because it constitutes an "eye of the beholder" test.[19] Like pornography, however, the courts and other lawyers "know it when they see it." There may be substance to it in a proper case, but the combination of doubt as to the viability of the standard, plus lack of egregiousness under the facts of this case, leads this court to stop short of finding a violation of Canon 9.

## III. SANCTION OF DISQUALIFICATION

The Tenth Circuit has long-recognized that "the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge, and his performance in this area is a matter of judicial discretion." *Redd v. Shell Oil Co.*, 518 F.2d 311, 314 (10th Cir.1975); *Waters v. Western Co. of North America*, 436 F.2d 1072, 1073 (10th Cir.1971). In *City Consumer* the court stated:

> To disqualify a party's chosen attorney is a serious matter. "Where an attorney's conflict of interest undermines the court's confidence in the vigor of his representation of the client, the court may disqualify the attorney."

571 F.2d at 970 (citations omitted). Regarding a district court's broad discretion, the Tenth Circuit has ruled that a court's

disposition of a disqualification motion will be reversed "only if the court has abused its discretion." *E.E.O.C.*, 749 F.2d at 621.

■ The Second Circuit has identified two circumstances in which disqualification will be ordered:

> (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage.

*Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980); (*quoting Board of Education v. Nyquist*, 590 F.2d at 1246). Under the Second Circuit view, the fact that the conduct in question has been found to constitute a violation of the Code of Professional Responsibility does not require disqualification of counsel as a matter of course. In *Matter of Bohack Corp.*, 607 F.2d 258, 263 (2d Cir.1979), it was noted that

> courts have indicated great reluctance to "separate a client from his chosen attorney where the alleged misconduct does not prejudice an opposing party and taint the litigation in which he is appearing."

More recently, in *Bottaro v. Hatton Assoc.*, 680 F.2d 895, 896–97 (2d Cir.1982), the court adopted "a restrained approach,"

---

tion of attorneys and the courts as possessing the integrity necessary for the disposition of justice. *See Margulies*, 696 P.2d at 1204. Similarly, the Supreme Court of Utah said *In re Hansen*, 586 P.2d 413, 416 (Utah 1978) (emphasis added):

> The practice of law is a profession whose members are granted a special privilege of holding themselves out as having the education, the skills and the integrity to give help and guidance to others in their affairs.... This includes that the attorney will become *unreservedly identified* with his client's interests and protect his rights. It means not only in dealing with the client's adversary, but also that the attorney will adhere to the ideals of

honesty and fidelity with the client himself; and that he will not use his position to take any unfair advantage of the special confidence which the client is entitled to repose in him.

**17.** These matters are discussed and authorities collected in C. Wolfram, *Modern Legal Ethics* § 7.1.4 (1986).

**18.** *Board of Education v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir.1979).

**19.** *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 609 (8th Cir.1977), *cert. denied* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978).

which calls for disqualification only upon a finding that the presence of a particular counsel will taint the trial by affecting his or her presentation of a case. *Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979); *McAlpin,* 625 F.2d at 444–446. We have conceded that this test will not "correct all possible ethical conflicts," *McAlpin,* 625 F.2d at 445, but have also noted that this laudable goal cannot be attained through rulings in the course of litigation without inviting the wholesale filing of motions for tactical reasons. The result would be needless disruption and delay of litigation, thereby impairing the efficient administration of justice. *See id.* at 438, 446. Where a threat of tainting the trial does not exist, therefore, the litigation should proceed, the remedy for unethical conduct lying in the disciplinary machinery of the state and federal bar. *Id.*

The sanction of disqualification of counsel in litigation situations should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon the trial. The egregiousness of the violation, the presence or absence of prejudice to the other side,[20] and whether and to what extent there has been a diminution of effectiveness of counsel are important considerations. In addition, equitable considerations such as the hardship to the other side and the stage of trial proceedings are relevant. The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit. For instance, in *Beck v. Board of Regents of State of Kan.,* 568 F.Supp. 1107 (D.C.Kan.1983) the court withheld its "inherent power" to disqualify stating that:

The court should not act unless "the offending attorney's conduct threatens to 'taint the underlying trial' with a serious ethical violation." *Field v. Freedman,* 527 F.Supp. 935, 940 (D.Kan.1981). Whether or not the underlying trial may become tainted must be addressed in each case based on its own specific facts. *Id.* at 1110. *See also Meat Price Investigators Assoc. v. Iowa Beef Processors, Inc.,* 448 F.Supp. 1 (S.D.Iowa 1977), *aff'd,* 572 F.2d 163 (8th Cir.1978).

■ In the case at bar, the conduct of the Howard firm does not so undermine the court's confidence in the firm's vigor and ability to fairly represent *Bodily* as to warrant disqualification. This case does not present a situation of one client gaining an unfair advantage over another by means of an attorney's unethical wrongdoing. The small amount of time spent and the very modest fee charged demonstrate that there was certainly no incentive for great reward on the part of counsel. In this case, there was no attempted or actual solicitation or receipt by the Howard firm of any confidential information of any kind. Although not sufficient to excuse the attorney's personal duty under Canon 5 to obtain informed consent after full disclosure, the fact that Johnson dealt with and relied upon a co-attorney rather than a lay person is significant as a mitigating factor.[21] There has been absolutely no prejudice to IHC in this case, and there would be no prejudice to the ultimate disposition of this case on the merits should the Howard firm be permitted to continue its representation of Bodily. Moreover, disqualification of the Howard firm at this juncture would substantially delay these proceedings and

---

**20.** Improper communications and disobeyed court rules were found as sufficient cause for disqualification of counsel in *Kleiner v. First Nat'l Bank,* 102 F.R.D. 754 (N.D.Ga.1983), *aff'd in part rev'd in part,* 751 F.2d 1193 (11th Cir. 1985) (reversed for lack of due process hearing on disqualification). But cf. *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268 (2d Cir.1975), wherein the court held that an attorney need not be disqualified where the improper communication does not prejudice the other party.

**21.** In *Margulies,* the court emphasized that the law firm's "reliance on a lay person" to pass on crucial conflict of interest information without requiring "adequate assurances that he had done so properly" was "simply not sufficient to meet the standard of professional conduct." While not a controlling distinction in this case, Johnson's reliance upon a co-attorney similarly to convey such critical information does mitigate in favor of the Howard firm. 696 P.2d at 1203–04.

doubtless would work an undue hardship not only on the plaintiff Bodily, but upon plaintiffs in the other cases pending.

After weighing all of the facts and circumstances of this case, this court concludes that disqualification is not merited in this instance.

This Memorandum Decision and Order is in all respects final and counsel need neither prepare nor submit additional memoranda or orders for the court's consideration.

IT IS SO ORDERED.